# In the United States Court of Federal Claims

No. 23-0688
(Filed under seal: September 26, 2024)
(Reissued for Publication: October 7, 2024)[1]

```
*****************************************
ROTAIR AEROSPACE CORPORATION,         *
                                      *
                Plaintiff,            *
                                      *
        v.                            *
                                      *
THE UNITED STATES,                    *
                                      *
                Defendant,            *
                                      *
        and                           *
                                      *
THE BOEING COMPANY,                   *
                                      *
                Defendant-Intervenor. *
*****************************************
```

*Ryan C. Bradel*, Ward & Berry PLLC, Tysons, VA, counsel for Plaintiff. With whom was *James M. White*, Marshall & White, PC, Washington, DC, of counsel.

*Tanya B. Koenig*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant. With whom was *Ashley Kelly*, DLA Aviation, of counsel.

*Noah B. Bleicher*, Jenner & Block LLP, Washington, DC, counsel for Defendant-Intervenor. With whom were *Moshe B. Broder*, *Andrew L. Balland*, and *Sierra A. Paskins*, of counsel.

**OPINION AND ORDER**

**DIETZ, Judge.**

      Rotair Aerospace Corporation ("Rotair") protests a decision by the Defense Logistics Agency ("DLA") to procure spare arm assemblies and bell cranks for the Apache helicopter from The Boeing Company ("Boeing") in a sole-source procurement. Rotair contends that DLA's sole-source decision lacks a rational basis because the government failed to conduct a reasonable investigation into its own data rights. It further argues that the Department of the Army ("Army")

---

[1] This Opinion and Order was filed under seal on September 26, 2024, *see* [ECF 94], in accordance with the Protective Order entered on May 18, 2023, *see* [ECF 9]. The parties were given an opportunity to identify protected information for redaction. The parties filed a joint status report on October 4, 2024, with no proposed redactions. [ECF 96].

violated procurement law by removing it from the list of approved sources for the manufacture of arm assemblies and by failing to assist Rotair in becoming requalified as an approved source. In response, the government and Boeing argue that Rotair has not demonstrated that DLA's decision to award a sole-source contract to Boeing was arbitrary, capricious, an abuse of discretion, or not in accordance with law. They also move to dismiss Rotair's protest under Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), arguing that Rotair lacks standing to bring its claims. As reasoned below, the Court finds that Rotair has standing to bring its protest. However, the Court also finds that DLA's sole-source decision had a rational basis and that Rotair has not demonstrated a clear and prejudicial violation of procurement regulations by the Army. Accordingly, Rotair's motion for judgment on the administrative record ("MJAR") is **DENIED**, the government's and Boeing's motions to dismiss are **DENIED**, and their cross-MJARs are **GRANTED**.

I.      BACKGROUND

The Apache is a combat helicopter fielded by the Army. *See* AR 478.[2] The Systems Readiness Directorate ("SRD") for the Army provides engineering and technical support on spare parts for the Apache. AR 478, 724.[3] Within the Army, the Aviation and Missile Command ("AMCOM") manages and procures these spare parts. AR 724. AMCOM procures almost all its spare parts through a "build to print" process. *Id.* To facilitate this process, AMCOM provides contractors with a technical data package ("TDP"), which functions as an instruction manual for contractors to manufacture the part. AR 724-25; *see, e.g.*, AR 174-245 (TDP for arm assembly and bell crank). The TDP comprises drawings, part lists, and specifications. AR 724-25. It is organized from the top down, with top-level drawings describing a part at the assembly level and identifying its major components and lower-level drawings focusing on subassemblies. *Id.* The drawings include parts lists, as well as specifications that provide detailed instructions on the manufacturing process for each part. *Id.*

Although AMCOM may provide contractors with the TDP for the spare part, the government may have different data rights to the underlying drawings, part lists, and specifications. *See* AR 725. "Data rights" refers to the government's rights to use, disclose, reproduce, or distribute copies of certain types of information. *See* Federal Acquisition Regulation ("FAR") 27.401 (setting forth the different types of data rights that the government may have). The term includes rights to technical data.[4] *Id.* The government's data rights in technical data range from "unlimited rights,"[5] which allow the government to "use, modify, reproduce, perform, display, release, or disclose technical data in whole or in part, in any manner, and for any purpose whatsoever, and to have or authorize others to do so," Defense Federal Acquisition Regulation Supplement ("DFARS") 227.7103-6(a)(16); DFARS 227.7101,

---

[2] The Court cites to the administrative record filed by the government at [ECF 18] as "AR ___". The Court uses the page numbers indicated on the bottom right corner.

[3] The Court cites to the Declaration of John W. Farris for undisputed background facts only. *See* AR 724-27.

[4] "Technical data" is defined as "recorded information . . . of a scientific or technical nature." FAR 2.101.

[5] The government has "unlimited rights" in technical data that "pertain[] to an item, component, or process which has been or will be developed exclusively with Government funds." DFARS 227.7103-5(a)(1).

to "limited rights,"[6] which prohibit the government from using, releasing, or disclosing the technical data "outside the Government without the permission of the contractor asserting the restriction," DFARS 227.7103-5(c)(2). The government may challenge data rights restrictions asserted by a contractor. *See* DFARS Procedures, Guidance, and Information ("PGI") 217.7506 3-303.2(c)(2)(i) (noting that unsubstantiated data rights "shall be challenged"); DFARS 252.227-7037 (Validation of Restrictive Markings on Technical Data).

AMCOM also designates certain Apache spare parts as "critical safety item[s]." AR 725. Spare parts designated as such, or that otherwise require new source testing, must be procured from an approved source. *See* DFARS 209.270-3; AMCOM Regulation 702-7 (June 19, 2017) (Section 2-2, Acquisition Requirements).[7] "All prospective manufacturers, or distributors, seeking to compete for a solicitation for [AMCOM] Spares, for any restricted source parts, are required to be an AMCOM approved source." AR 1109. To become an approved source, prospective manufacturers must complete the Source Approval Request ("SAR") process administered and managed by the Army. *Id.* The SAR process evaluates a prospective manufacturer's ability to provide an aircraft part that meets the Army's standards. *Id.* It requires prospective manufacturers to "[p]rovide a complete and current copy of the [TDP] required to manufacture the part." AR 1119. Some of the technical data may be made available by the government. *Id.* Although DLA procures Apache spare parts on behalf of the Army, the only entity that can review and approve sources is the SRD Sustainment Division ("SD"). AR 338, 1109. "Source approval must be obtained prior to being considered for contract award." AR 1109.

On March 8, 2022, DLA issued a solicitation for spare Apache arm assemblies. AR 276. The solicitation indicated that it was restricted to Boeing, as the only approved source. AR 277. After reviewing the solicitation and noticing that it was not listed as an approved source, Rotair emailed the Contracting Officer ("CO") on March 31, 2022, to explain that AMCOM SRD SD previously approved Rotair as a source of the arm assembly. AR 328. Rotair requested that the CO correct the solicitation to include Rotair as a responsible offeror. *Id.* On April 4, 2022, the CO responded that DLA is procuring spare arm assemblies on behalf of the Army, that "the [AMCOM SRD SD] is the **sole authority** to determine all approved sources," and that "the [TDP] (dated 4 February 2022) does not list Rotair [as] an approved source for manufacture of the Arm Assembly." AR 327 (emphasis in original). The CO stated that DLA "stringently" adheres to the TDP and encouraged Rotair to seek source approval by submitting a SAR to compete in future solicitations. *Id.*

On July 1, 2022, Rotair filed a protest with the Government Accountability Office ("GAO"), challenging DLA's decision to procure the arm assembly from Boeing under a sole-source contract. AR 1038. Rotair argued that DLA's decision to exclude Rotair was unreasonable because Rotair was previously approved as a source of the arm assembly and had

---

[6] The government has "limited rights" in technical data that "pertain to items, components, or processes developed exclusively at private expense." DFARS 227.7103-5(c)(1)(i).

[7] AMCOM Regulation 702-7 is available at https://govtribe.com/file/government-file/atttachment-0012-amcom-regulation-702-7-19-june-2017-dot-pdf (last accessed September 26, 2024).

not been notified of its removal from the approved sources list. AR 1043-44. Rotair also argued that it should not be required to undergo the SAR process again because it was already an approved source, as evidenced by a letter from AMCOM SRD SD. AR 1040-41. This protest was dismissed on July 19, 2022, AR 1052-53, after DLA indicated its intention to cancel the solicitation and address Rotair's concerns by considering whether Rotair should be listed as an approved source, AR 1049-50; U.S. Gov't Accountability Office, Rotair Aerospace Corporation (SPRRA1-22-R-0033) (July 19, 2022), https://www.gao.gov/docket/b-420853.1. In its July 11, 2022, letter to the GAO, DLA stated that it had "submitted a request to the Engineering Support Activity (ESA) to determine whether Rotair should be listed as an approved source." AR 1049. DLA further stated that, "[i]f the ESA determines Rotair should be an approved source, corrective action will be taken to allow Rotair to submit a proposal in future solicitations for this item," but that "[i]f the ESA determines Rotair should not be an approved source, proper notification will be sent to Rotair." *Id.* Thereafter, Rotair received a letter from the Army stating the following:

> The [SRD] has been notified that the latest technical data available to the Army for the part listed in Table 1 have been marked proprietary by the Original Equipment Manufacturer. Therefore, Rotair . . . cannot be allowed to bid on future solicitations because the Government cannot distribute a complete technical data package.

AR 346. On September 12, 2022, DLA issued a Sources Sought Synopsis seeking qualified manufacturers for two Apache parts: the arm assembly and the bell crank. AR 28-29. On September 16, 2022, DLA issued a Pre-Solicitation Notice. AR 31. Three days later, on September 19, 2022, Rotair contacted the CO to inquire whether the prior solicitation for the arm assembly, issued on March 8, 2022, was still open and whether the notice related to a separate requirement. AR 33. The CO informed Rotair that the prior solicitation had been canceled and that the notice posted on September 16, 2022, reflected a new requirement with new requisitions and new TDPs. *Id.*

On September 20, 2022, DLA executed a Justification and Approval ("J&A") for using a sole-source procurement to acquire 500 arm assemblies and 160 bell cranks from Boeing. AR 35-38. To justify the sole-source procurement, the CO selected the following option on the J&A form: "The rights to use the data needed to purchase this part from additional source(s) are not owned by the Government and cannot be purchased, developed, or otherwise obtained." AR 36. The CO also selected an option that stated: "Based upon the technical certification on file, technical data is not available and cannot be developed to permit full and open competition. The data presently available reflects the minimum needs of the Government." AR 37. Further, the CO indicated that the acquisition was restricted to Boeing as "the only source[] of supply known to have the capability of furnishing the required supplies/services." AR 35-36. Regarding "[t]he actions[] being taken to overcome barriers to competition before subsequent acquisition[s] are made," the CO specified that "[f]irms are encouraged to seek source approval in order to compete for future solicitations by emailing [the Army]," that "[c]urrently, there are no outstanding qualification requests on this item," and "this is a continuous method of identifying potential new sources of supply." AR 38.

4

On September 30, 2022, DLA issued the solicitation for the arm assemblies and bell cranks. AR 50-51. The solicitation stated that "[t]his requirement is restricted to the Boeing Company," AR 51, and it listed Boeing as the only approved source, AR 54. Further, it provided that the arm assembly was not a "critical safety item" but that it required "engineering testing (fatigue test)," and that the bell crank was a "critical safety item." AR 51. The solicitation had a value of $3,297,460.80. AR 8, 18.

On the day DLA issued the solicitation, Rotair submitted a formal objection to the CO regarding the Pre-Solicitation Notice. AR 1076. Rotair challenged the sole-source procurement decision, stating that "the sole basis for eliminating all competition is DLA's erroneous belief that the Government has no legal right to provide the technical data (i.e. drawings) for the [arm assembly and bell crank] to third parties." AR 1077 (emphasis in original). On November 29, 2022, DLA responded that it was "procuring on behalf of the Army," that the Army "provides the requirement and the [TDP]," and that DLA "does not approve sources." AR 1086. DLA then "encourage[d] Rotair to contact the AMCOM SRD SD Source Approval Team with any source concerns." *Id*. Unsatisfied with this response, Rotair filed a second GAO protest on January 9, 2023. AR 259. Rotair's second protest was subsequently dismissed as untimely. *See* AR 1366.

On May 9, 2023, Rotair filed the instant bid protest alleging that DLA and the Army improperly removed it from the approved sources list for the arm assembly and were "unreasonably and unlawfully preventing [Rotair] from competing [for] the current award by not reinstating [Rotair] as an approved source." Am. Compl. [ECF 25] ¶ 2. According to Rotair, DLA mistakenly assumed that Boeing possessed the data rights to the arm assembly specifications leading DLA to wrongly decide that it could not share the specifications with other sources, and to arbitrarily determine that no source other than Boeing could compete under the solicitation. *Id.* ¶ 3. Rotair also alleges that the mistaken assumption that Boeing was the only approved source led DLA to "improper[ly] and unreasonab[ly]" procure the arm assembly and bell crank together. *Id.* ¶¶ 19, 59. Boeing filed an unopposed motion to intervene on May 11, 2023, which the Court granted. [ECFs 4, 8].

On May 24, 2023, the government produced the administrative record. [ECF 18]. On June 16, 2023, Rotair filed a motion to supplement the administrative record with historical contract and funding documents pertaining to the development of the Apache arm assembly specifications, Pl.'s Mot. to Compel [ECF 26] at 5-10[8], which the Court denied on July 12, 2023, Mem. Op. and Order [ECF 33].[9] On September 8, 2023, Rotair filed a motion to complete the administrative record with Boeing's proprietary specifications, the Army's airworthiness analysis and conclusions, and the government's qualification requirements and market research efforts. Pl.'s Mot. to Compel Completion [ECF 50] at 4. Rotair also sought to depose certain individuals, who it contends were involved in the sole-source procurement decision. *Id.* at 10. The Court

---

[8] All page numbers in the parties' briefs refer to the page number generated by the CM/ECF system.

[9] On July 28, 2023, Rotair filed a notice of its appeal of the Court's July 12, 2023, decision, [ECF 34], and subsequently filed a motion to stay the case pending appeal, [ECF 37]. The Court denied the motion to stay on August 22, 2023, holding that Rotair's appeal was improper and unlikely to succeed. [ECF 42]. The United States Court of Appeals for the Federal Circuit dismissed the appeal as improper on November 7, 2023. [ECF 63].

denied this motion on September 26, 2023. Mem. Op. and Order [ECF 53]. On October 13, 2023, Rotair filed a motion for reconsideration, Pl.'s Mot. for Recons. [ECF 57], which the Court denied on December 1, 2023, Order [ECF 66]. Rotair filed its MJAR on December 27, 2023. [ECF 70]. The government and Boeing filed motions to dismiss Rotair's protest for lack of standing pursuant to RCFC 12(b)(6) and cross-MJARs. Def.'s Cross-MJAR [ECF 74], Boeing's Cross-MJAR [ECF 75]. The motions are fully briefed, and the Court held oral argument on July 17, 2024. *See* Tr. for July 17, 2024 [ECF 92].[10]

**II.    LEGAL STANDARDS**

The Tucker Act grants this Court jurisdiction "to render judgment on an action by an interested party objecting to . . . a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). The Tucker Act's waiver of sovereign immunity for actions under 28 U.S.C. § 1491(b)(1) "covers a broad range of potential disputes arising during the course of the procurement process." *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380 (Fed. Cir. 2012). The procurement process includes "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." *Id.* at 1381 (emphasis omitted) (quoting *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1244 (Fed. Cir. 2010)).

To bring a bid protest under 28 U.S.C. § 1491(b), a protestor must establish statutory standing. *Bitscopic, Inc. v. United States*, 166 Fed. Cl. 677, 694 (2023). A motion to dismiss on the grounds that the protestor lacks statutory standing under 28 U.S.C. § 1491(b)(1) is considered under Rule 12(b)(6). *Bitscopic, Inc.*, 166 Fed. Cl. at 696 (citing *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023)). "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). On a motion to dismiss under RCFC 12(b)(6), the court must accept as true a complaint's well-pleaded factual allegations and construe them in the manner most favorable to the plaintiff. *See Iqbal*, 556 U.S. at 678-79. The court "primarily consider[s] the allegations in the complaint, [but it] may also look to 'matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record.'" *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1147 (Fed. Cir. 2014) (internal quotation marks omitted) (second alteration added in *A&D Auto Sales, Inc.*). All reasonable inferences must be drawn in favor of the non-moving party. *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). To avoid dismissal, a complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing that the plaintiff is entitled to the relief sought. *Twombly*, 550 U.S. at 557. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Dismissal "for failure to state a claim upon which relief

---

[10] The Court initially scheduled oral argument for April 4, 2024. Order [ECF 82]. However, the Court had to cancel oral argument that day due to the unavailability of Rotair's counsel. *See* Pl.'s Mot. to Modify Schedule [ECF 84]. The Court rescheduled oral argument for May 30, 2024. Order [ECF 85]. Once more, however, the Court had to cancel oral argument that day due to the unavailability of Rotair's counsel. Order [ECF 86].

can be granted is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).

Under RCFC 52.1, "a party may file an [MJAR] for the Court to assess whether an administrative body . . . acted in compliance with the legal standards governing the decision under review." *Agile Def., Inc. v. United States*, 143 Fed. Cl. 10, 17 (2019). Such a motion "is often an appropriate vehicle to scrutinize an agency's procurement actions because such cases typically involve interpretation of contract documents or regulations, thereby presenting no disputed issues of material fact." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1352 (Fed. Cir. 2004). An MJAR "provide[s] for trial on a paper record, allowing fact-finding by the trial court." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). This Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006).

This Court reviews agency decisions in bid protests, including those challenging a sole-source award, using the standard of review set forth in the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(4); *accord Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d. 1324, 1332 (Fed. Cir. 2001); *KSD, Inc. v. United States*, 72 Fed. Cl. 236, 255 (2006). The APA standard permits a court to set aside an agency's contracting decision if the protestor shows it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *accord Bannum*, 404 F.3d at 1351. "Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts." *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 105 Fed. Cl. 541, 559 (2012) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)), *aff'd*, 720 F.3d 901 (Fed. Cir. 2013). "The test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001). If the reviewing court finds that the agency's action evinced rational reasoning and consideration of relevant factors, it must sustain the agency's action. *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974)). When a challenge is brought on the ground that the procurement action violated a statute or regulation, the protestor must show "a clear and prejudicial violation." *Impresa*, 238 F.3d at 1333. In addition to showing that the government's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, "[t]he protestor must then show that it 'was prejudiced as a result – that it had a substantial chance to receive the award but for that error.'" *Newimar S.A. v. United States*, 160 Fed. Cl. 97, 128 (2022) (quoting *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 386-87 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004)).

### III. DISCUSSION

Rotair argues that DLA's decision to award a sole-source contract to Boeing is arbitrary and in contravention of the Competition in Contracting Act ("CICA") because "[t]he government

failed to conduct a reasonable investigation into its own data rights prior to making its sole source determination." [ECF 70] at 6. It further argues that the government violated FAR 9.207(b) and 10 U.S.C. § 3243 when it "removed [Rotair] as an approved source in 2015, yet failed to disclose this fact to [Rotair] for eight years" and failed to "provide [Rotair] with information regarding any deficiencies in [the unrestricted specifications] in order to assist [Rotair] in requalifying for approved status." *Id.* at 11-12. The government and Boeing move to dismiss Rotair's protest for lack of statutory standing pursuant to RCFC 12(b)(6), arguing that Rotair is ineligible to compete for the contract because it is not currently an approved source for the arm assembly and has never been an approved source for the bell crank. [ECF 74] at 22; [ECF 75] at 14. They further argue that DLA's decision to procure the arm assembly and bell crank spares in a sole-source procurement was rational and compliant with CICA, and that there was no prejudicial violation of FAR 9.207(b) and 10 U.S.C. § 3243. [ECF 74] at 27, 38; [ECF 75] at 24-26, 37. As explained below, the Court finds that Rotair has standing to bring its bid protest, that DLA had a rational basis for its sole-source decision, and that Rotair has not demonstrated a clear and prejudicial violation of FAR 9.207(b) or 10 U.S.C. § 3243.

### A. Rotair Has Statutory Standing under the Tucker Act

The government argues that "[t]o establish standing, Rotair must be able to establish both an interest in the specific procurement and capability to compete, which cannot be inferred." [ECF 74] at 22. According to the government, Rotair cannot establish its ability to compete "because it is not currently on the approved source list for either part and has never been on the approved source list for the bell crank." *Id.* (emphasis removed). Rotair maintains that, "in both its GAO Protest and Complaint," it challenged the bundling of the arm assembly and bell crank requirements as improper. Pl.'s Reply [ECF 78] at 7; *see also id.* at 8 (citing AR 263; [ECF 25] at 6). Thus, Rotair argues that it "has standing not only because the bundling [was] tied to the erroneous sole source determination (which is central to this protest) but because [it] is capable of competing for a bundled award if necessary." [ECF 78] at 8.

In bid protests, standing "is framed by 28 U.S.C. § 1491(b)(1) which . . . imposes more stringent standing requirements than Article III." *Chromalloy San Diego Corp. v. United States*, 145 Fed. Cl. 708, 730 (2019) (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009)). To satisfy the Tucker Act's standing requirements, the plaintiff must first demonstrate that it is an "interested party." 28 U.S.C. § 1491(b)(1). An "interested party" is an "actual or prospective bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (internal quotation marks omitted and emphasis removed). "Generally, to prove the existence of a direct economic interest, a [protestor] must show that it had a 'substantial chance' of winning the contract." *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (quoting *Rex Serv.*, 448 F.3d at 1308). Next, the plaintiff "must establish prejudice by showing that it would have had a substantial chance of receiving the award." *Emery Worldwide Airlines*, 264 F.3d at 1086 (citing *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)). "Although the inquiries may be similar, prejudice must be shown either as part of, or in addition to, showing a direct economic interest." *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018). The plaintiff "can establish prejudice either by showing [that]: (1) proceeding without the violation would have made the procurement

official's decision to make a sole-source award rather than to conduct a competitive bidding process irrational . . . and in a competitive bidding process, the complaining party would have a substantial chance of receiving the award . . . or (2) proceeding without the violation, the complaining party would have a substantial chance of receiving the sole-source award[.]" *Emery Worldwide Airlines*, 264 F.3d at 1086 (citations omitted). Whether a protestor is an interested party "is a matter of statutory standing only, which is not jurisdictional." *REV, LLC v. United States,* 91 F.4th 1156, 1163 (Fed. Cir. 2024) (citing *CACI*, 67 F.4th at 1151). Additionally, "[t]he requirement to show prejudice, like the 'interested party' requirement, is statutory, not jurisdictional. *REV*, 91 F.4th at 1163. In assessing whether a party was prejudiced, the Court "must assume that the party will, if permitted to proceed with its claim, prevail on the merits." *Id.* at 1164.

Rotair has demonstrated that it has statutory standing to challenge the alleged procurement errors. In its amended complaint, Rotair alleges that DLA's decision to procure the arm assembly and bell crank spares using a sole-source contract was arbitrary because the Army possesses the necessary technical data rights to allow competition, [ECF 25] ¶ 56, that Rotair has previously manufactured and delivered the arm assembly to the Army, *id.* ¶ 25, that the Army improperly removed Rotair from the approved sources list for the arm assembly, *id.* ¶¶ 2, 74, and that DLA improperly bundled the arm assembly and bell crank acquisitions, *id.* ¶¶ 19, 38-41, 60. Additionally, Rotair alleges that, even if the solicitation remains improperly bundled, it has the capability to manufacture the bell crank. *Id.* ¶¶ 22, 60, 93. These allegations, taken as true, establish that Rotair would have a substantial chance of being awarded a contract in a competitive bidding process.[11] Rotair's complaint therefore satisfies the Tucker Act's standing requirements.

The Court is not persuaded by the argument that Rotair cannot demonstrate an ability to compete because Rotair cannot manufacture the bell crank and is not currently on the approved sources list for either the arm assembly or the bell crank. These grounds for attacking Rotair's standing are at the heart of Rotair's challenges and cannot operate to exclude Rotair as an interested party. In *Cubic Defense Systems, Incorporated v. United States*, the court acknowledged that such a circular argument was impermissible:

> When synthesized, Cubic's argument is essentially that, but for the Government's improper interpretation of the . . . contract and resulting wrongful failure to obtain the . . . technical data, Cubic would have been able to compete for the . . . contract. Stated in this "but for" manner plainly reveals that Cubic's claim points to the Government's actions as the cause of its inability to compete and as the root cause of the alleged CICA violation. Therefore, to accept the Government's arguments potentially would allow the

---

[11] The government acknowledges that Rotair alleges improper bunding in its complaint but suggests that the Court should deem the argument abandoned due to Rotair's failure to address it in its MJAR. [ECF 74] at 23 n.10. However, for purposes of a motion to dismiss under RCFC 12(b)(6), the Court accepts as true a complaint's well-pleaded factual allegations and construes them in a manner most favorable to the plaintiff. *See Iqbal*, 556 U.S. at 678-79. Accordingly, the Court examines whether Rotair has alleged sufficient facts in its complaint to determine if it has stated a claim upon which judicial relief can be granted.

> Government, through its own actions, to exclude a party from a procurement, thereby hindering competition, and then rely upon those actions to contend that the excluded party was not a prospective offeror and thus not an interested party. To do so would subvert the aims of CICA, constrict this court's jurisdiction in contrast with Congress' recent expansion of it, and enable the Government to assert standing to immunize its planned sole-source procurements from CICA-based challenges.

45 Fed. Cl. 239, 247 (1999) (citations omitted). The same can be said in this case. Rotair argues that, but for it being improperly removed from the approved sources list for the arm assembly and but for the improper bundling of the arm assembly procurement with the bell crank procurement, it would have been able to compete for an arm assembly contract. As such, Rotair's approval status and inability to manufacture the bell crank cannot serve as a basis for this Court's concluding that it is ineligible to compete. *See Chromalloy*, 145 Fed. Cl. at 732 ("Because Chromalloy has not been deemed ineligible to be awarded the overhaul services contract on a requirement it is not challenging . . . it is qualified to compete for the contract.").

### B.   DLA Had a Rational Basis for Awarding a Sole-Source Contract

Rotair argues that CICA mandates that "restrictive requirements . . . be limited to the agency's immediate needs." [ECF 70] at 7. Relying on *Chromalloy*, Rotair asserts that the government cannot require a contractor to seek technical data elsewhere when it possesses sufficient rights in the requisite technical data. *Id.* According to Rotair, the government was required to conduct a reasonable investigation into its own data rights prior to making its sole-source decision. *See id.* at 8-10. Rotair contends that, here, there is no evidence that such an investigation was conducted into the data rights for the arm assembly. *Id.* In contrast, the government asserts that DLA "has no obligation to independently investigate the Government's data rights." [ECF 74] at 28. The government contends that DLA "reasonably relied on the Army's representations of its rights in the technical data," and "sufficiently justified a sole-source contract to Boeing because Boeing was the only approved source. [ECF 74] at 27-28. The government also asserts that, even if an investigation were required, DLA's "actions were sufficient to conclude that a sole-source [award] to Boeing was warranted." *Id.* at 35.

Under CICA, an agency "shall obtain full and open competition through the use of competitive procedures" when procuring goods or services. 10 U.S.C. § 3201(a)(1). However, CICA provides numerous exceptions to the competition requirements. 10 U.S.C. § 3204(a)(1)-(7); *see also* FAR 6.302. Relevant here, CICA permits an agency to use non-competitive procedures when the agency determines that its needs are "available from only one responsible source . . . and no other type of property or services will satisfy the needs of the agency." 10 U.S.C. § 3204(a)(1); *see also* FAR 6.302-1(a)(2). To utilize a sole-source contract, the CO must "justif[y] the use of such procedures in writing and certif[y] the accuracy and completeness of the justification." 10 U.S.C. § 3204(e)(1)(A); *see also* FAR 6.303-1(a). The justification must be approved by an authorized official, 10 U.S.C. § 3204(e)(1)(B)(i), and include "a description of the agency's needs," 10 U.S.C. § 3204(e)(2)(A). The justification must also include "an identification of the statutory exception from the requirement to use competitive procedures and

a demonstration, based on the proposed contractor's qualifications or the nature of the procurement, of the reasons for using that exception." 10 U.S.C. § 3204(e)(2)(B). "Each justification shall contain sufficient facts and rationale to justify the use of the specific authority cited." FAR 6.303-2(a).

Here, the record demonstrates that DLA's decision to award a sole-source contract to Boeing in this instance complied with CICA and had a rational basis. First, AMCOM notified DLA of its requirement for 500 arm assemblies, AR 7-9, and 160 bell cranks, AR 17-19, using the AMC Form 1095G. AMCOM also provided DLA with the TDP List ("TDPL") for each part. AR 174-245. The AMC Form 1095G and the TDPL for each part state that the Army does not possess the specifications needed to manufacture these parts and that Boeing is the only approved source. Specifically, the AMC Form 1095G for the arm assembly lists "3D" as the Acquisition Method Reason Code ("AMRC")[12] and provides that the current specifications are unavailable. AR 11. The TDPL for the arm assembly states that "[t]he subject part [] is being restricted back to Boeing . . . as Boeing has indicated no further licensing agreements will be issued." AR 214. The TDPL for the arm assembly lists "3Q" as the AMRC. *Id.* The TDPL for the arm assembly contains a "Technical Certification for Proposed Other than Full & Open Competitive Acquisition of Spare Parts," which provided as follows:

> The technical data for this part has undergone full screening per the DFARS PGI 217.7506, Spare Parts Breakout Program. The assigned

---

[12] The Department of Defense Spare Parts Breakout Program assigns a number and letter code to each part. *See* DFARS PGI 217.7506 1-103.1. The program aims "to reduce costs through the use of competitive procurement methods, or the purchase of parts directly from the actual manufacturer rather than the prime contractor, while maintaining the integrity of the systems and equipment in which the parts are to be used." DFARS PGI 217.7506 1-102(b). The program "includes procedures for screening and coding parts in order to provide contracting officers summary information regarding technical data and sources of supply to meet the Government's minimum requirements." DFARS PGI 217.7506 1-102(c). Such "information assists the contracting officer in selecting the method of contracting, identifying sources of supply, and making other decisions in the preaward and award phases, with consideration for established parameters of system and equipment integrity, readiness, and the opportunities to competitively acquire parts." *Id.* "The identification of sources for parts . . . requires knowledge of manufacturing sources, additional operations performed after manufacture of parts possessing safety or other critical characteristics, and the availability of technical data." *Id.*

The assigned number and letter codes "describe to the [CO] and other Government personnel the results of a technical review of a part and its suitability for breakout." DFARS PGI 217.7506 1-103.1. "Breakout" means "[t]he improvement of the acquisition status of a part resulting from a technical review and a deliberate management decision." DFARS PGI 217.7506 1-103.9. Relevant to the instant procurement, "3" means that the government will need to "[a]cquire [the spare part], for the second or subsequent time, directly from the manufacturer." AR 36; *see also* DFARS PGI 217.7506 2-201.1(d) (stating that the government will need to "[ac]quire, for the second or subsequent time, directly from the actual manufacturer"). "D" means that "[t]he data needed to acquire this part is not economically available." AR 36; *see also* DFARS PGI 217.7506 2-201.2(d) ("The data needed to acquire this part competitively is not physically available, it cannot be obtained economically, nor is it possible to draft adequate specifications or any other adequate, economical description of the material for a competitive solicitation."). "P" means that "[t]he rights to use the data needed to purchase this part from additional source(s) are not owned by the Government and cannot be purchased, developed, or otherwise obtained." AR 36; *see also* DFARS PGI 217.7506 2-201.2(p). "Q" means that "[t]he Government does not have adequate data, lacks rights to data, or both" and that "[i]t is not economical to buy the data or rights to the data." AR 36; *see also* DFARS PGI 217.7506 2-201.2(q) (stating that "[t]he Government does not have adequate data, lacks rights to data, or both" and that "[t]he Government has been unable to economically buy the data or rights to the data").

> AMC/AMSC is 3D. This item will be acquired for the second or subsequent time directly from the actual manufacturer as indicated. The data needed to acquire this part competitively is not physically available, it cannot be obtained economically, nor is it possible to draft adequate specifications or any other adequate, economical description of the material for a competitive solicitation.

AR 226. The certification concludes that "[b]ased on the technical review, there is reasonable technical basis to conclude that this item is currently only available from [Boeing as] the [only] approved source[]." *Id.*

The AMC Form 1095G for the bell crank lists "3Q" as the AMRC and provides that the current specifications are unavailable. AR 21. The TDPL for the bell crank lists "3P" as the AMRC, states that the "current specifications . . . are proprietary information to Boeing," and specifies that "Boeing . . . is the source of supply." AR 178. The bell crank TDPL also contains a "Technical Certification for Proposed Other than Full & Open Competitive Acquisition of Spare Parts," which provides the following:

> The technical data for this part has undergone full screening per the DFARS PGI 217.7506, Spare Parts Breakout Program. The assigned AMC/AMSC is 3P. This item will be acquired for the second or subsequent time directly from the actual manufacturer as indicated. The rights to use the data needed to purchase this part from additional source(s) are not owned by the Government and cannot be purchased, developed, or otherwise obtained. The Government has access to the data but does not own the rights to the data. The rights ownership has been verified through the Project Management Office. There is no cause to contest the ownership of the rights.

AR 190. Like the certification for the arm assembly, the bell crank certification concludes that "[b]ased on the technical review, there is reasonable technical basis to conclude that this item is currently only available from [Boeing as] the [only] approved source[]." AR 191.

After AMCOM sent its AMC Form 1095G and related TDPLs to DLA, DLA justified the use of a sole-source contract in the J&A and obtained the necessary approvals. Within the J&A, DLA identified the agency's needs as 500 arm assemblies and 160 bell cranks. AR 35. The J&A also identifies 10 U.S.C. § 2304(c)(1), now codified at 10 U.S.C. § 3204(a)(1), as the statutory exception to the requirement to use competitive procedures. *Id.* This exception allows an agency to use a sole-source contract when its needs are available from only one responsible source. *See* 10 U.S.C. § 3204(a)(1). Additionally, the J&A indicates that the "acquisition is restricted to the only source[] of supply known to have the capability of furnishing the required supplies/services" and identifies that source as Boeing. AR 35-36. DLA also notes in the J&A that "[b]ased upon the technical certification on file, technical data is not available and cannot be developed to permit full and open competition," and that "[t]he data presently available reflects

the minimum needs of the Government." AR 37.[13] Finally, DLA executed the J&A using the appropriate approval authorities—the CO and the competition advocate. AR 38. Based on this record, the Court finds that DLA's decision to use a sole-source contract was rational and in accordance with CICA. *See Emery Worldwide Airlines*, 264 F.3d at 1085-86 (stating that "[t]he test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion" and thus whether that the agency's decision to award a sole-source contract was rational).

The Court reaches this conclusion despite Rotair's argument that the government failed to conduct a reasonable investigation. Citing *Chromalloy* for the proposition that "a reasonable investigation must take place in order for the Government to reasonably say whether it has [technical data] rights," [ECF 78] at 11, Rotair avers that "[a] key distinction between the Government's actions in *Chromalloy* and those of the Government here is the research and review of prior contracts for the purchase of the subject item." [ECF 70] at 7. According to Rotair, there is no evidence that DLA or the Army "reviewed its prior contracting history to ascertain its data rights." *Id.* at 8. Despite Rotair's contentions, the Court is not persuaded that DLA was required to conduct further investigation into its data rights prior to making its sole-source decision. As stated in *Chromalloy*: "The court's task is not to determine whether the [agency] took all possible investigatory steps to ascertain its rights in the . . . technical data. Rather, given the discretion accorded government officials conducting a procurement, the court's focus is on whether the [agency's] investigation was reasonable." 145 Fed. Cl. at 735. In other words, the Court must determine whether the agency action and resultant decision were rational. *See Emery Worldwide Airlines*, 264 F.3d at 1086. Here, the record shows that DLA had a rational basis for its sole-source decision. The technical certifications within the administrative record provide that each part has "undergone full screening" as part of the Spare Parts Breakout Program. AR 190, 226; *see also* AR 478 (specifying that the program involves "screening and coding parts in order to provide contracting officers summary information regarding technical data and sources of supply to meet the Government's minimum requirements"). The information generated as part of this screening "assists the contracting officer in selecting the method of contracting, identifying sources of supply, and making other decisions in the preaward and award phases, with consideration for established parameters of system and equipment integrity, readiness, and the opportunities to competitively acquire parts." DFARS PGI 217.7506 1-102(c). Additionally, the record shows that DLA inquired about Rotair's status as an approved source for the arm assembly and was told the following by the SRD: "Due to Boeing marking all their drawings [and] specifications as proprietary, all other sources except for Boeing were removed as the government cannot provide the technical data to anyone else." AR 1048. Thus, the record

---

[13] To the extent that Rotair challenges DLA's decision to procure the spare parts based on the latest specifications that are proprietary to Boeing rather than older specifications, such a challenge cannot succeed because the determination of "an agency's minimum need is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess." *Savantage Fin. Servs., Inc. v. United States*, 150 Fed. Cl. 307, 325 (2020) (quoting *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (internal citations omitted) (alterations in original); *see also Infrastructure Def. Techs., LLC v. United States*, 81 Fed. Cl. 375, 394 (2008) ("DLA's discretion in determining its needs or more accurately its needs for a supply contract to fill military orders, is a matter within the broad discretion of agency officials . . . and not for this court to second guess") (internal citations omitted).

reflects that DLA considered the government's rights to and the availability of the requisite technical data in its decision to use a sole-source contract to acquire the spare parts.[14]

### C.    Rotair Has Not Demonstrated a Clear and Prejudicial Violation of FAR 9.207(b) or 10 U.S.C. § 3243

Rotair states that it "was an approved source to provide [the arm assembly] . . . to the Government" and that it "lost its approval status in 2014" without timely notice as required by FAR 9.207(b). [ECF 70] at 11. Rotair further contends that "since [it] was in possession of unrestricted specifications already, the Government was obligated [under FAR 9.207(b) and 10 U.S.C. § 3243] to provide it with information regarding any deficiencies in these specification versions in order to assist [it] in requalifying for approved status." *Id.* at 12. Rotair argues that the government is required by 10 U.S.C. § 3243 to "(1) clearly articulate the qualification requirement for this procurement and (2) ensure that such qualification was the 'least restrictive' means of meeting the Government's needs." *Id.* at 13. Rotair asserts that "[d]isclosure of this information to [Rotair], rather than forcing [Rotair] to acquire a costly license, is certainly a less restrictive path for [Rotair]." *Id.*

According to the government, Rotair's complaints about the source approval process "are not appropriate for resolution in the context of this bid protest" because the source approval process is handled by the Army, not DLA. [ECF 74] at 38. The government states that "the qualification requirement at issue here is the requirement that an offeror be on the approved sources list before competing for an award," *id.*, that the qualification requirement "was not made in the context of this procurement," *id.* at 39, and that the qualification requirement stems from the arm assembly and bell crank being critical items that require testing, *id.* at 38-39. The government maintains that "the qualification requirement is not, as Rotair alleges, 'access to documents in Boeing's possession that contractors must pay for." *Id.* at 39 (citing [ECF 70] at 13). The government argues that "neither § 3243 nor the FAR require the Army (much less DLA Aviation) to 'assist' Rotair or any other offeror in qualifying as an approved source." *Id.* Further,

---

[14] Rotair also asks this Court to "[r]ule that where earlier versions of technical data were provided by a contractor to the Government without restriction, the legal burden is on the contractor to demonstrate that later versions of this technical data may no longer be received or released in an unrestricted form." [ECF 70] at 19. Rotair contends that the government holds the "erroneous belief that it lacks sufficient data rights to provide the full TDPL," [ECF 78] at 6, and that such belief "led the Government to 'bundle' the arm assembly and bell crank requirements," *id.* Thus, Rotair asserts that "[t]he issue at the center of this protest is the question of the Government's technical data rights." [ECF 70] at 4. Rotair notes, however, that it "is not bringing this action to establish the Government's data rights, but instead to call attention to the manner in which the Government determined its own rights." *Id.*

Under 10 U.S.C. § 3782 and DFARS 252.227-7037, the government may challenge a contractor's inclusion of restrictive markings in technical data. As explained in DFARS 252.227-7037, such a challenge may be litigated as a claim under the Contract Disputes Act. *See generally* DFARS 252.227-7037(d)-(g); *see also Raytheon Co. v. United States*, 146 Fed. Cl. 469, 475 (2020) ("[T]he Court rejects the government's contention that it lacks jurisdiction to consider [plaintiff's] claim that the CO's directive was invalid because she failed to follow the statutory procedures governing challenges to restrictive markings."). Without addressing whether Rotair may intervene in a data rights dispute between the government and a contractor, the Court maintains that in this case, "[t]he proper inquiry . . . is whether the DLA's procurement procedures and resultant decisions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Mem. Op. and Order [ECF 41] at 4 (internal quotation marks omitted); *see also* Mem. Op. and Order [ECF 56] at 2. To the extent that Rotair moves this Court to order the Army to conduct further investigation into its data rights, the Court declines to do so.

14

while the government concedes that "the Army likely violated FAR 9.207(b) by waiting until 2022 to notify Rotair of its removal from the approved source list," *id.* at 40, it asserts that this violation was not prejudicial to Rotair because it did "not invalidate the decision to remove Rotair from the list," *id.*

Rotair has not demonstrated a clear and prejudicial violation of FAR 9.207(b). The regulation states:

> After considering any . . . conditions reasonably related to whether a product or source continues to meet the standards specified for qualification, an agency may take appropriate action without advance notification. The agency shall, however, *promptly notify the affected parties if a product or source is removed* from a [Qualified Products List], [Qualified Manufacturers List], or [Qualified Bidders List], or will no longer be identified as meeting the standards specified for qualification. *This notice shall contain specific information why the product or source no longer meets the qualification requirement*.

FAR 9.207(b) (emphasis added). Rotair was removed from the approved source list for the arm assembly in 2014. AR 473, 725. The Army notified Rotair of its removal in a letter dated July 18, 2022. AR 346. FAR 9.207(b) clearly requires that Rotair be *promptly* notified if it is removed from the approved sources list. Eight years between removal and notification is not prompt notification, and the government concedes as much. [ECF 74] at 40 (stating that "the Army likely violated FAR 9.207(b) by waiting until 2022 to notify Rotair of its removal from the approved source list"). However, the Army's notification otherwise complied with the requirements of FAR 9.207(b). The Army provided Rotair with "specific information" about why it no longer met the qualification requirement by explaining that the latest technical data for the arm assembly had been marked proprietary by Boeing and that, therefore, the Army could not distribute a complete TDP to allow Rotair to compete on future solicitations. AR 346. While certainly not detailed, the notification informed Rotair as to the specific reason why it was no longer an approved source for the arm assembly.[15] Despite Rotair's objections to the level of detail in the notification, the regulation does not require that the notification contain more, nor does it require that the notification provide a path to requalification. *See Def. Integrated Sols., LLC v. United States*, 165 Fed. Cl. 352, 369 (2023) ("When the text is unambiguous, the court need only read and apply the plain language of the regulation.").

Having shown that the Army violated FAR 9.207(b) by failing to provide it with timely notice of its removal from the approved sources list, Rotair must now show that it was prejudiced by the violation. *See Impresa*, 238 F.3d at 1333 (stating that a protestor must show "a clear and prejudicial violation of applicable statutes and regulations"). To establish prejudice, Rotair must

---

[15] To meet the qualification requirements and become an approved source, the SAR process requires that the part manufacturer possess the Original Equipment Manufacturer TDP for the part or become an alternate manufacturer through reverse engineering. *See* AR 1114, 1116-17. It follows that, if the Army cannot provide Rotair with the latest TDP for the part, then Rotair no longer meets the qualification requirements because it does not possess the latest TDP for the part that it seeks to manufacture.

show that, if it had proceeded without the violation, Rotair would have had "a substantial chance of receiving the award." *Emery Worldwide Airlines*, 264 F.3d at 1086 ("To establish prejudice in an action involving an alleged statutory or regulatory violation, a protester must show that absent the error, there was a substantial chance it would have received the contract award.") (internal quotation marks omitted). In this regard, Rotair argues that it was prejudiced because the Army precluded it from "contemporaneously contest[ing] [the Army's] decisions and actions relating to and leading to its removal." [ECF 70] at 11-12. The Court agrees that the Army's failure to provide prompt notice precluded Rotair from challenging its removal at that time and precluded it from seeking requalification earlier, which may have enabled Rotair to again compete for arm assembly contracts. *See SAI Indus. Corp. v. United States*, 60 Fed. Cl. 731, 743-44 (2004) ("This stringent [notice] standard exists because Congress wishes to encourage maximum competition for government contracts, and such notice will sufficiently enable the de-listed supplier to correct the perceived deficiencies and again compete for contracts."). In this instance, however, the Court finds that a determination of prejudice would be too speculative.

For Rotair to have had a substantial chance of receiving an award, Rotair would have had to have been reinserted on the approved sources list after successfully challenging its removal or attaining requalification by submitting a SAR. If Rotair were to have succeeded in either attempt, then DLA would have had to issue a new solicitation solely for arm assemblies because Rotair is not, and has never been, an approved source for the bell crank. Of course, if Boeing had not been the only approved source for arm assemblies, it is possible that DLA would have done so. Nevertheless, while Rotair has shown that the Army violated FAR 9.207(b)'s notice requirement, it has not shown that the basis for its removal from the approved sources list was improper or arbitrary. Moreover, since receiving notice of its removal, Rotair has not sought to attain requalification as an approved source of arm assemblies by submitting a SAR. As a result, it is unclear what the outcome of that process would have been. Consequently, the Court does not find that, had the Army timely notified Rotair of its removal as an approved source, Rotair would have had a substantial chance at receiving an award. *See Allied Materials Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (collecting cases showing that not every violation of regulation results in prejudice); *WaveLink, Inc. v. United States*, 154 Fed. Cl. 245, 287 (2021) (collecting cases finding that unsupported speculation is insufficient to establish prejudice).

Additionally, Rotair has not shown that DLA's decision to issue a sole-source contract to Boeing as the only approved source for the arm assembly and bell crank was arbitrary. Thus, the Army's untimely notice did not prejudice Rotair because, while the notice concerned the removal of Rotair as an approved source of the arm assembly, the challenged solicitation requires approved sources for the arm assembly *and* the bell crank. AR 77. Although Rotair sufficiently alleges that the government improperly bundled these requirements for standing purposes, *see supra* Section III.A, Rotair fails to demonstrate, or even argue, on the merits that the bundling of these requirements was improper.[16] *See McVey Co., Inc. v. United States*, 111 Fed. Cl. 387, 404

---

[16] "[W]hen a plaintiff asserts a claim in its complaint but then fails to pursue it in a dispositive motion, the court can deem that claim abandoned or waived." *Chromalloy*, 145 Fed. Cl. at 740; *see also IAP Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265, 306 (2022) (finding that protestor's failure to address claims in its MJAR resulted in protestor being deemed to have abandoned those claims). Rotair attempts to revive its improper bundling argument in its reply brief, but this attempt is unavailing. *See Homeland Sec. Sols., Inc. v. United States*, 162 Fed. Cl. 535, 546 (2022) (rejecting plaintiff's attempt to revive its arguments in its reply brief in support of its MJAR).

16

(2013) (explaining that "the prejudice determination for standing purposes assumes all non-frivolous allegations to be true" but the determination at the merits stage "is based only on allegations which have been proven true"). Moreover, Rotair has not shown that it is (or ever has been) approved to manufacture the bell crank. *See generally* [ECF 70] (neglecting to mention "bell crank" in the brief). Therefore, even if the Army had timely notified Rotair of its removal from the approved sources list for the arm assembly, Rotair would not have had a substantial chance at an award under the challenged solicitation because Rotair failed to demonstrate DLA's improper bundling of the requirements or show that Rotair was, or could become, an approved source for the bell crank. *See B.H. Aircraft Co. Inc. v. United States*, 158 Fed. Cl. 750, 765 (2022) (finding that because protestor cannot meet the requirements of the contract, it "is neither an actual or prospective bidder for [the contract] . . . nor has [protestor] demonstrated a 'substantial chance' of being awarded such a contract").[17]

The Court also finds that Rotair has not demonstrated a clear violation of 10 U.S.C. § 3243. Section 3243 provides instructions for establishing a qualification requirement. It defines a "qualification requirement" as "a requirement for testing or other quality assurance demonstration that must be completed by an offeror before award of a contract." 10 U.S.C. § 3243(a); *accord W.G. Yates & Sons Const. Co., Inc. v. Caldera*, 192 F.3d 987, 994 (Fed. Cir. 1999) ("Qualification requirements . . . are activities which establish the experience and abilities of the bidder to assure the government that the bidder has the ability to carry out and complete the contract."). It requires that an agency take certain actions prior to establishing a qualification requirement, such as specifying the requirements a prospective offeror must satisfy to become qualified, ensuring that the requirements are limited to those least restrictive to meet its purpose, and providing a prompt opportunity for a prospective offeror to demonstrate its ability to meet the specified standards. *See generally* 10 U.S.C. § 3243(b)(1)-(6). Further, Subsection (c)(3) provides:

> A potential offeror may not be denied the opportunity to submit and have considered an offer for a contract solely because the potential offeror (A) is not on a qualified bidders list, qualified manufacturers list, or qualified products list, or (B) has not been identified as meeting a qualification requirement established after October 19, 1984, if the potential offeror can demonstrate to the satisfaction of the contracting officer (or, in the case of a contract for the procurement of an aviation critical safety item or ship critical safety item, the head of the design control activity for such item) that the potential offeror or its product meets the standards established for qualification or can meet such standards before the date specified for award of the contract.

---

[17] The instant case is distinguishable from *SAI Industries*. In that case, SAI challenged its removal from the approved sources list for a military aircraft tailpipe in the context of a solicitation to procure only that part. *See SAI Indus.*, 60 Fed. Cl. at 733. The court found that the Army's delayed notice of removal prejudiced SAI in relation to its chances to obtain an award. *Id.* at 745-46. Here, Rotair challenges its removal from the approved sources list for the arm assembly. The pertinent solicitation, however, is one to procure spare arm assemblies *and* bell cranks. Rotair has never been an approved source of bell cranks.

17

10 U.S.C. § 3243(c)(3). Also, Subsection (c)(5) states that "[t]he head of an agency need not delay a proposed procurement in order to comply with subsection (b) or in order to provide a potential offeror with an opportunity to demonstrate its ability to meet the standards specified for qualification." 10 U.S.C. § 3243(c)(5). Under Subsection (b)(6), the agency is required to promptly inform a potential offeror "as to whether qualification is attained and, in the event qualification is not attained, [to] promptly furnish[] specific information why qualification was not attained." 10 U.S.C. § 3243(b)(6).

While Section 3243 thus creates certain obligations that an agency must undertake when establishing a qualification requirement, Rotair has not demonstrated a clear violation of these obligations by DLA or the Army. For instance, Subsection (b)(2) requires that the agency "specify in writing and make available to a potential offeror, *upon request*, all requirements which a prospective offeror . . . must satisfy in order to become qualified." 10 U.S.C. § 3243(b)(2) (emphasis added). Similarly, Subsection (b)(4) requires that the agency "ensure that a potential offeror is provided, *upon request* and on a reimbursable basis, a prompt opportunity to demonstrate its ability to meet the standards specified for qualification . . . ." 10 U.S.C § 3243(b)(4) (emphasis added). The record does not show that Rotair requested the qualification requirements for the arm assembly or bell crank or that DLA or the Army refused to provide them. Furthermore, while Subsection (c)(3) provides that a potential offeror may not be denied the opportunity to submit an offer solely because the offeror is not on the qualified bidders list, this applies only when the potential offeror demonstrates that it or its product meets the qualification requirements or can meet such requirements before the contract award date. *See* 10 U.S.C. § 3243(c)(3). The record in this case does not show that Rotair attempted to make such a demonstration for the arm assembly or bell crank, or that it was denied an opportunity to do so.

Here, the solicitation provided that "qualification requirements apply to the supplies . . . covered by this contract" and that the "source must have demonstrated that it meets the standards prescribed for qualification before award of this contract." AR 86. It further provided that competition is restricted to "sources that have been approved by . . . the Government for supply of item(s) listed in this solicitation, to assure the requisite safe, dependable, effective operation and support of military equipment." AR 77. Additionally, the solicitation provided that the arm assembly and the bell crank require engineering testing. AR 51. It instructed that "[o]fferors should contact the [Army SRD] to obtain all requirements that they or their products or services . . . must satisfy to become qualified and to arrange for an opportunity to demonstrate their abilities to meet the standards specified for qualification," AR 86, and that "offerors . . . seeking to obtain source approval, must submit a [SAR] package, for review and approval, to the Engineering Directorate (ED), Quality Engineering Division." AR 77. It advised that "[u]nless determined to be in the Government[']s interest, award of this contract shall not be delayed to permit an offeror to submit evidence of qualification." AR 87 (alteration added); *see also* AR 77 (noting "that offeror requests for source approval in conjunction with this procurement will not be a cause for delay in this solicitation action"). However, it also provided that "if it is determined that additional sources will clearly benefit the Government and that any delay incident to their approval would not impact readiness, a reasonable delay may be entertained." AR 77. It stated that "[a]ll approval or disapproval notices shall be officially provided to the contractor by the appropriate technical official." AR 78.

The qualification requirement in the instant solicitation is to be an approved source. AR 77. Therefore, despite Rotair's dissatisfaction with its removal as an approved source for the arm assembly, it was incumbent on Rotair to submit a SAR package in accordance with the solicitation instructions to determine whether it satisfied the standards established by the Army for the arm assembly and bell crank. *See* AR 1109 ("Once a SAR has been submitted, the SAR review process is conducted to evaluate a prospective vendor's ability to provide an aircraft part that meets the standards set forth by the U.S. Army."). In addition to the solicitation requirements, DLA also informed Rotair that "[a]ll prospective manufacturers, or distributors, seeking to propose in response to an AMCOM Spares solicitation, for any restricted source parts, are required to be an AMCOM approved source" and that "Rotair's approved or disapproved source concerns should be sent to the AMCOM SRD SD." AR 246; *see also* AR 338. Through this process, Rotair would have had an opportunity to demonstrate its ability to meet the qualification standards and, if qualification was not attained, to learn why. Yet, the record shows that Rotair has not commenced the SAR process for either part. *See* AR 734; *see also* Tr. of July 17, 2024, Oral Arg. [ECF 93] at 13 (stating that "[Rotair's Counsel] advised [Rotair] to begin that process . . . [b]ut they haven't"). In sum, Rotair has not shown a clear and prejudicial violation of 10 U.S.C. § 3243 by DLA or the Army.[18]

## IV.   CONCLUSION

Rotair asks the Court to "[d]irect the Government to rescind its award of the arm assembly contract to Boeing . . . [d]irect DLA, as the procuring agency, to conduct a reasonable and proper investigation into the Government's data rights . . . [d]irect DLA to correct the Government's violations of law with respect to Plaintiff's qualification rights, specifically its right to receive information from the Government that describes the deficiencies the Government identified with Plaintiff's own specifications . . . [and] [a]fford Plaintiff a 'reasonable opportunity' to qualify and compete for the subject arm assembly award." [ECF 70] at 18-19. When deciding if injunctive relief is warranted, the Court considers whether: "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004)). Achieving success on the merits "is a necessary element for a permanent injunction." *Dell Fed. Sys. v. United States*, 906 F.3d 982,

---

[18] Rotair argues that it is "prevented from submitting a SAR *unless and until* Defendant fulfills its statutory obligation to share [] information and to make available Army personnel that understand why [Rotair] was removed in the first place." [ECF 78] at 25 (emphases in original). Rotair further argues that "Defendant has already told [Rotair] a SAR will not be approved unless Plaintiff has access to the full TDPL." *Id.; see also* [ECF 70] at 14 (stating that "the Government itself has already told Rotair that any SAR package it submits will be denied *unless* Rotair has access to the Boeing proprietary specifications") (emphasis in original). However, Rotair has not demonstrated that it is being "prevented" from submitting a SAR or that its submission would be futile. Furthermore, the record shows that access to the Boeing-proprietary specifications is not necessary to obtain approval through the SAR process. *See* AR 1117; *TAT Techs., Ltd. v. United States*, 128 Fed. Cl. 109, 111-12 (2016) (alternative source for military part used reverse engineering to seek qualification through SAR process). The Court will not speculate on how the Army would handle a SAR submitted by Rotair.

19

999 (Fed. Cir. 2018). In this case, because Rotair has not succeeded on the merits of its protest, it is not entitled to injunctive relief.

For the reasons set forth above, Rotair's MJAR [ECF 70] is **DENIED**, the government's and Boeing's motions to dismiss are **DENIED**, and the government's and Boeing's cross-MJARs [ECFs 74, 75] are **GRANTED**. The Clerk is **DIRECTED** to enter judgment accordingly.

Some information contained in this Opinion and Order may be considered protected information subject to the Protective Order entered on May 18, 2023. [ECF 9]. Accordingly, the Opinion and Order is filed **UNDER SEAL**. The parties **SHALL CONFER** and **FILE** on or before **October 4, 2024**, a joint status report that: identifies the information, if any, that the parties contend should be redacted; explains the basis for each proposed redaction; and includes an attachment of the proposed redactions for this Opinion.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge